or regulatory power' refers to the enforcement of state laws affecting health, welfare, morals, and safety, but not regulatory laws that directly conflict with the control of the *res* or property by the bankruptcy court." *Id.* Thus, this case provides guidance as to when the police powers exception to the automatic stay does not apply — i.e., when government action, brought pursuant to the police or regulatory powers of a state or the federal government, is *not* related to the enforcement of laws affecting health, welfare, morals, or safety, such as when the action is actually brought to interfere with the jurisdiction of the bankruptcy court. In effect, I believe that the majority's discussion of the public policy test narrows the test considerably, and I find this infringement upon the lawful authority of state and federal agencies in favor of vesting increased power in the bankruptcy courts particularly troubling. *Cf. Board of Governors of the Federal Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 40 (1991) (commenting that, in deciding a case under the police powers exceptions, a proposed interpretation was "problematic, both because it conflict[ed] with the broad discretion Congress has expressly granted many administrative entities and because it [wa]s inconsistent with the limited authority Congress has vested in bankruptcy courts").

   Thus, a number of courts, including this one, have held that the police powers exception to the automatic stay applies where, in the majority's words, the government agency's "suit serves little public purpose other than a general interest in seeing law enforced," at least where the law at issue is related to health, welfare, morals, or safety. The wage and hours laws at issue in this case are related to such concerns, and thus the majority's holding cannot be reconciled with many precedents — including our own — interpreting and applying the public policy exception to the automatic stay. For this reason, I respectfully dissent.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0384P (6th Cir.)
File Name: 01a0384p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————

ELAINE CHAO, Secretary of
Labor, United States
Department of Labor,
          *Plaintiff-Appellee,*

          *v.*

HOSPITAL STAFFING
SERVICES, INC.; CAPITAL
FACTORS, INC.; RON LUSK,
individually and as President
of Hospital Staffing Services,
Inc.,
          *Defendants,*

KENNETH WELT, Bankruptcy
Trustee for Hospital Staffing
Services, Inc.,
          *Defendant-Appellant.*

Nos. 99-6147/6487

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 99-02165—Bernice B. Donald, District Judge.

Argued: January 25, 2001

Decided and Filed:  October 31, 2001

Before:  BOGGS and MOORE, Circuit Judges; and BELL,
District Judge.[*]

———————

**COUNSEL**

———————

**ARGUED:** Arthur H. Rice, RICE & ROBINSON, Miami, Florida, for Appellant.    Ellen R. Edmond, U.S. DEPARTMENT OF LABOR, OFFICE OF THE SOLICITOR, Washington, D.C., for Appellee. **ON BRIEF:** Arthur H. Rice, Lisa M. Schiller, RICE & ROBINSON, Miami, Florida, for Appellant.    Ellen R. Edmond, Paul Frieden, U.S. DEPARTMENT OF LABOR, OFFICE OF THE SOLICITOR, Washington, D.C., for Appellee.

BOGGS, J., delivered the opinion of the court, in which BELL, D. J., joined.  MOORE, J. (pp. 33-36), delivered a separate dissenting opinion.

———————

**OPINION**

———————

BOGGS, Circuit Judge.  In the United States District Court for the Western District of Tennessee, the Secretary of Labor filed suit seeking an injunction to prohibit the trustee of a bankrupt corporation then undergoing liquidation in the bankruptcy court for the Southern District of Florida from moving in commerce certain records that the Secretary deemed "hot goods."  The workers who produced the records for the corporation had not been paid in accordance with the minimum wage and overtime provisions of the Fair Labor

———————

[*] The Honorable Robert Holmes Bell, Chief United States District Judge for the Western District of Michigan, sitting by designation.

difficult.    Instead, we merely required that the agency's exercise of its regulatory powers be related to the declared public policies supporting those powers.  This was the case even though the actual benefits derived from the proceeding would flow to particular individuals.

Other circuits have reached similar conclusions.  In *EEOC v. Rath Packing Co.*, 787 F.2d 318 (8th Cir.), *cert. denied*, 479 U.S. 910 (1986), for example, the Eighth Circuit held that the police powers exception to the automatic stay applied to a Title VII action, even though such actions are clearly brought "at the behest of and for the benefit of specific individuals." *See id.* at 325 (quotation omitted).  The majority cites *Rath Packing* and even recognizes that, given such precedents, "many cases will be close."  But the majority completely avoids explaining how the present case can be distinguished from that at issue in *Rath Packing*.  Indeed, under the majority's version of the police powers exception, *Rath Packing* (as well as any number of other cases) would likely have been decided the other way.[1]

At the same time, the majority is correct to note that all government actions are not covered by the police powers exception to the automatic stay.  Thus, in *Missouri v. U.S. Bankruptcy Court*, 647 F.2d 768 (8th Cir. 1981), *cert. denied*, 454 U.S. 1164 (1982), the Eighth Circuit held that the State of Missouri's efforts to interfere with the bankruptcy court's jurisdiction over the actual property of the debtor by means of the state's grain laws did not fall within the police powers exception.  *See id.* at 776.  Based on the legislative history and case law, the Eighth Circuit stated that "the term 'police

———————

[1] *See, e.g., Eddleman v. Dep't of Labor*, 923 F.2d 782 (10th Cir. 1991) (holding that Labor Department action brought to recover unpaid wages under the Service Contract Act fell within the police powers exception to the automatic stay), *overruled on other grounds by Temex Energy, Inc. v. Underwood, Wilson, Berry, Stein & Johnson*, 968 F.2d 1003 (10th Cir. 1992).  *See also Eddleman*, 923 F.2d at 791 n.12 (collecting similar cases).

concedes — but simply an action by the Labor Department to recover unpaid wages on behalf of particular individuals.

In my view, however, it is irrelevant whether this case involves "hot goods," because under our precedents the police powers exception would apply even if this were a "pure" § 216(c) suit to recover unpaid wages. In *Ohio v. Mansfield Tire & Rubber Co. (In re Mansfield Tire & Rubber Co.)*, 660 F.2d 1108 (6th Cir. 1981), for example, we held that the police powers exception excepted from the automatic stay the efforts of the Ohio commission charged with adjudicating workers' compensation claims. In that case, we concluded that, for purposes of the police powers exception, there was no distinction between the state of Ohio's valid exercise of its police powers in enacting workers' compensation laws and the extension of that power through the administration of such claims. *See id.* at 1113. We did not require the Ohio commission to demonstrate some clear connection between those claims and a broader public interest — in effect, the commission's efforts to administer the workers' compensation claims of particular individuals was sufficient for the action to fall within the police powers exception.

Similarly, in *NLRB v. Edward Cooper Painting, Inc.*, 804 F.2d 934 (6th Cir. 1986), we held that an NLRB proceeding against an employer for unfair labor practices fell within the police powers exception to the automatic stay and was thus enforceable despite the employer's subsequent bankruptcy filing. The employer in that case had engaged in unfair labor practices by unilaterally terminating its collective bargaining agreement with its three employees. *See id.* at 937. The NLRB order at issue mandated, inter alia, the reinstatement of one of those employees with back pay. *See id.* at 937-38. Nevertheless, we held that this proceeding satisfied the "public policy" test purportedly applied by the majority in the present case. *See id.* at 942. We did not require the NLRB to demonstrate the potential effects of the challenged unfair labor practice on broader public interests, which, given the small number of employees involved would have been

Standards Act. The Trustee claimed the district court lacked jurisdiction to entertain the injunction action because the records had become subject to the exclusive jurisdiction of the bankruptcy court. The district court disagreed and, after permitting the Trustee to consolidate all the tainted goods in Memphis and dispose of them as he saw fit, entered a preliminary injunction ordering the Trustee to deposit with the clerk of the court the amount the Secretary claimed was necessary to "purge the taint" from the records, *i.e.*, to change the status of the records from "hot goods" to ordinary goods. Viewed in light of the particular facts of this case, the Secretary's suit is not in furtherance of her statutory powers to regulate and enforce labor standards, but rather is designed to and would, if allowed to proceed, promote the private rights of unpaid workers vis-a-vis other creditors of the debtor's estate. Such a suit does not fall within the Bankruptcy Code's § 362(b)(4) exception to the automatic stay. Therefore, the district court has no jurisdiction to entertain the Secretary's suit. We reverse the district court, vacate its orders, and remand with instructions to dismiss the case.

I

Hospital Staffing Services, Inc., and fourteen affiliated companies (collectively "HSSI" or the "debtor") unsuccessfully engaged in the business of providing home health care and other health-related services to patients in various locations throughout the country, primarily in Tennessee and New England. While much of HSSI's revenue came from Medicare and private insurance reimbursements, it relied on a secured revolving loan agreement with Capital Healthcare Financing ("CHF"), a division of Capital Factors, Inc., for most of its operating capital. On March 16, 1998, HSSI filed a petition for Chapter 11 reorganization in the Bankruptcy Court for the Southern District of Florida (the "bankruptcy court").

As Debtor in Possession, HSSI stayed afloat for almost one year. In order to fund its operations, HSSI sought bankruptcy court approval to incur debt and obtain credit from CHF. On July 7, 1998, the bankruptcy court approved the credit relationship: it granted CHF an $8,000,000 super-priority lien, pursuant to 11 U.S.C. § 364(d), on all of the debtor's assets, in exchange for CHF's continuing to advance funds under a formula dependent upon the debtor's accounts receivable, billing, and collections. Pursuant to the terms of the bankruptcy court's order, CHF applied funds from all receivables collected during the pendency of the Chapter 11 case to pay off HSSI's pre-petition debts. By May 1998, only post-petition debts remained.

HSSI did not emerge from Chapter 11. In late January 1999, the borrowing base on which the debtor's financing relied had deteriorated, to the extent that its financing agreement left it only $240,000 in available credit to fund overhead expenses, including employee salaries. CHF extended this final amount on February 5, 1999. The debtor nevertheless stopped paying certain employees' wages as of January 23, 1999. HSSI's president ordered cessation of all Tennessee operations by February 17, 1999, and all New England operations by February 18, 1999. HSSI converted its Chapter 11 reorganization to a Chapter 7 liquidation the following day. The bankruptcy court appointed Kenneth Welt as the debtor's trustee ("Trustee"). Welt ultimately represented to the bankruptcy court that he expected to marshal and liquidate approximately $5,000,000 in assets of the debtor, a figure well below the amount of CHF's loan secured by the super-priority § 364(d) lien.

On February 25, 1999, six days after the conversion to Chapter 7, Alexis Herman, then United States Secretary of Labor ("Secretary"),[1] filed suit in the United States District

---

[1]Elaine Chao presently serves as Secretary of Labor. She has automatically been substituted as plaintiff-appellee in this matter for former Secretary Herman, pursuant to FED. R. APP. P. 43(c)(2). The

_____

## DISSENT

_____

KAREN NELSON MOORE, Circuit Judge, dissenting. The district court held that the Labor Department's "hot goods" action at issue in this case falls within the Bankruptcy Code's police powers exception, 11 U.S.C. § 362(b)(4), and thus is not subject to the automatic stay. The majority disagrees, concluding that, based on "the particular facts of this case," the police powers exception does not apply. Because I do not agree with the majority's narrow interpretation of the police powers exception, I respectfully dissent. In sum, I do not believe that the "the particular facts of this case" can plausibly be distinguished from other cases — including Sixth Circuit precedents — in which the police powers exception has been held to apply.

In the present case the majority concludes that the Labor Department's action "incidentally serves public interests but more substantially adjudicates private rights" and thus falls outside of the police powers exception. The action "more substantially adjudicates private rights" because, in the majority's estimation, this case involves only the recovery of wages owed by the debtor to its employees and thus does not implicate broader public interests. Even the Labor Department's effort to cast this as a "hot goods" action, i.e., as an action to enjoin the movement of tainted goods in interstate commerce, fails, according to the logic of the majority, as the "hot goods" in question are hospital records and thus not really "goods" at all. Because the records in question will not compete with goods produced in compliance with federal wage and hours standards, the majority reasons that no broader public interest is implicated by the Labor Department's action. In the majority's view, then, this is not really a "hot goods" case — for most such actions will fall within the police powers exception, as even the majority

Thus, claims other than those for an administrative expense that arise after the original filing but before conversion are treated, for purposes of the § 362(a)(1) limitation on the automatic stay, as if they had arisen before the original filing and are, accordingly, covered by the stay. Claims specified in § 503(b), however, are not treated as if they arose before the original petition and retain their administrative expense status even after conversion. Any such claim must be filed with the bankruptcy court as a motion for allowance of an administrative expense, *see* 11 U.S.C. § 503(a), or an ordinary claim against the estate, *see* 11 U.S.C. § 501. *See also* FED. R. BANKR. P. 5005(a)(1) (specifying that proofs of claim "shall be filed with the clerk in the district where the case under the Code is pending"); *cf.* 11 U.S.C. § 362(a)(3) (staying— without limitation as to when the acts giving rise to a claim took place or the claim itself arose— any "act to obtain possession of property of the estate . . . or to exercise control over property of the estate").

If the Secretary's suit is a claim for an administrative expense— on the theory that employees' 29 U.S.C. § 216(b) rights to back wages and damages for FLSA violations constitute administrative expenses of the estate and a pure § 216(c) suit by the Secretary asserts those rights on behalf of the employees— it had to be filed in the bankruptcy court. If the claim the Secretary's suit asserts is not a claim for an administrative expense, 11 U.S.C. § 348(d) directs that it be treated as if it arose prior to commencement of the original bankruptcy proceeding, and the instant action therefore falls within the reach of § 362(a)(1). In either event, district court had no jurisdiction to entertain the Secretary's suit.

## IV

For the reasons set forth above, the judgment of the district court is **REVERSED**, its orders are **VACATED**, and this case is **REMANDED** with instructions to **DISMISS** for want of jurisdiction.

Court for the Western District of Tennessee ("district court") to enforce certain provisions of the Fair Labor Standards Act ("FLSA"). The FLSA requires, among other things, payment of minimum and overtime wages to certain employees. *See* 29 U.S.C. §§ 206 (minimum wage), 207 (maximum hours and overtime), 213 (exemptions). The Secretary contended that certain of the debtor's records, including clinical patient reports and billing information, had been produced in violation of the FLSA's wage provisions because approximately 600 HSSI employees had not been paid their wages during the company's last weeks of operation. The Secretary sought an injunction barring the Trustee from transporting such records across state lines under the "hot goods" provision of 29 U.S.C. § 215(a) (making it "unlawful for any person— (1) to transport, offer for transportation, ship, deliver, or sell in commerce . . . any goods in the production of which any employee was employed in violation of section 206 or section 207 of this title . . . .").[2] The Secretary claims she initiated this case in the district court under the enforcement powers conferred upon her in the FLSA.[3]

---

"Secretary" refers to Chao, Herman, or their predecessors, as appropriate.

[2] Because the Trustee has not appealed the district court's ruling that the records subject to the Secretary's action are "goods" within the meaning of 29 U.S.C. §§ 203(i), 215(a)(1), we express no opinion on the matter.

[3] *See* 29 U.S.C. § 216(c) ("The Secretary may bring an action in any court of competent jurisdiction to recover the amount of unpaid minimum wages or overtime compensation and an equal amount as liquidated damages. The right provided by subsection (b) of this section to bring an action by or on behalf of any employee to recover [unpaid minimum wages and overtime compensation] shall terminate upon the filing of a complaint by the Secretary . . . . Any sums thus recovered by the Secretary of Labor on behalf of an employee pursuant to this subsection shall be held in a special deposit account and shall be paid . . . directly to the employee or employees affected."); *see also* 29 U.S.C. § 217 ("The district courts . . . shall have jurisdiction, for cause shown, to restrain

The district court entered a temporary restraining order a week later, permitting the Trustee to marshal the debtor's assets but enjoining the Trustee from transferring or removing any messages, documents, bills, invoices, or other goods from the debtor's headquarters in Memphis. The Trustee needed these records of and relating to services rendered by HSSI employees in order to bill patients and seek Medicare and private insurance reimbursement. The Trustee questioned the district court's jurisdiction to entertain the suit, and the court took his dismissal motion under advisement. In response to a series of motions by both sides, the district court held that it had jurisdiction over the Secretary's suit and the allegedly hot goods, reasoning that the suit was an exercise of the Secretary's police power, which excepted it from the automatic stay provision of 11 U.S.C. § 362(a). Nevertheless, the district court permitted the Trustee to proceed with any steps necessary to collect outstanding debts owed to the debtor for services rendered by HSSI's employees in the waning days of operations. The court later issued a preliminary injunction ordering the Trustee to deposit $616,158, the amount the Secretary estimated was necessary to purge the "taint" from the allegedly hot goods, with the Clerk of the District Court for the Western District of Tennessee.

Meanwhile, in Florida, CHF and the trustee reached an agreement, approved by the bankruptcy court with minor modifications, to distribute the debtor's assets. Under the plan, the Trustee would marshal and liquidate all of the debtor's assets. The plan included using the records originally subject to the Secretary's suit for purposes of billing clients, Medicare, and private insurance. From the Trustee's collections, CHF would immediately receive $50,000 that it had paid to finance certain aspects of the bankruptcy proceeding after the Chapter 7 conversion. After receiving this initial payment, CHF agreed to pay for any

violations of section 215 of this title.").

---

### III

The Secretary presents an alternative argument. She claims that § 362(a)(1) does not stay the instant action because this judicial proceeding relates to post-petition conduct of the debtor insofar as the records in question did not exist at the time of the original bankruptcy filing and the debtors' employees had not performed the work that generated them. As the Secretary formulates it, her argument apparently seeks to invoke the limitation on the § 362(a)(1) automatic stay, which applies only to an "action or proceeding against the debtor that . . . could have been commenced before the commencement of the case under this title." 11 U.S.C. § 362(a)(1). The Secretary's argument depends further on her contention that HSSI's conversion of its bankruptcy from Chapter 11 to Chapter 7 had no effect on attempts to collect a post-petition-debt because such conversion does not re-trigger the automatic stay provision, so as to reimpose the stay. *See In re State Airlines, Inc.*, 873 F.2d 264, 267-69 (11th Cir. 1989) (refusing to reimpose the stay against parties previously granted relief therefrom), *but see Matter of Nichols*, 134 B.R. 236 (Bankr. S.D. Ohio 1991) (imposing a new stay), *and In re Parker*, 154 B.R. (S.D. Ohio 1993) (holding that court may, in its discretion impose a new stay).

The Code does not clearly address whether conversion "reimposes" the automatic stay and courts have split on the question. But this notion of inquiring whether conversion "reimposes" the stay for purposes of analyzing the limitation on § 362(a)(1) seems academic because other Code provisions adequately address the question at issue. The Code provides that "[a] claim against . . . the debtor that arises after the order for relief [*i.e.* the original filing of the petition, *see* 11 U.S.C. § 301] but before conversion in a case that is converted under section 1112 . . . of this title, other than a claim specified in section 503(b) of this title [an administrative expense], shall be treated for all purposes as if such claim had arisen immediately before the date of the filing of the petition." 11 U.S.C. § 348(d) (emphasis added).

compete with fairly produced goods. Instead, the purpose served by the Secretary's "hot goods" injunction action is merely to enforce against the Trustee the fair-labor servitude, the beneficiaries of which are the workers who went unpaid by HSSI in late January and February 1999.[17]   In this particular case, then, the injunction action is merely a vehicle to enforce the private rights of the employees to the minimum portion of their wages Congress guaranteed. Therefore, to the extent this lawsuit is a "hot goods" action pursuant to § 217, it is not covered by the police power exception.

Under whichever authority the Secretary brought this suit, it fails the "public policy" test of whether a governmental unit brought suit "to enforce such governmental unit's . . . police and regulatory power," so the § 362(b)(4) exception to the automatic stay does not apply to the instant action. Because the police power exception does not apply, the automatic stay bars "the commencement or continuation . . . of [this] judicial . . . proceeding against the debtor that was or could have been commenced before the commencement of the" debtor's bankruptcy case, 11 U.S.C. § 362(a)(1), and prevents this "act to obtain possession of property of the estate . . . [and] exercise control over property of the estate . . . ." 11 U.S.C. § 362(a)(3). Hence, the Bankruptcy Court for the Southern District of Florida had exclusive jurisdiction over the debtor and the property of its bankruptcy estate. The district court should have dismissed the case for lack of jurisdiction.

---

[17]The Secretary did not object to the district court's order allowing the Trustee to move the records in interstate commerce to Memphis and then use the records to generate accounts receivable. Instead, she adopted the novel theory of describing funds collected on the accounts receivable as "tainted funds" and sought the order directing deposit of enough funds to clear the taint from the goods with the district court clerk. Although the Secretary's action in the course of litigation cannot, of course, be used to remove any jurisdiction the district court may have had, it does confirm that the Secretary's real interest in prosecuting this enforcement action is the vindication of the workers' private rights.

professionals engaged and expenses incurred by the Trustee in completing the liquidation, and then split the remaining assets with other creditors. Under the plan, CHF would receive 75% of the remaining assets collected by the Trustee, with 25% going to a Creditor Pool containing the other outstanding claims against the estate, all of which were post-petition administrative expenses. The Trustee was to draw his statutory fee from the Creditor Pool's share. However, if the Secretary's suit were ultimately successful, any funds used to pay a judgment (or "clear a taint" from the goods) would come out of the Creditor Pool's share.

Following the district court's denial of his motion to dismiss, the Trustee moved the bankruptcy court to assert its jurisdiction over the debtor and all its assets to the exclusion of all other courts. The bankruptcy court apparently agreed with the Trustee's view of the case. In recommended findings of fact and conclusions of law, the bankruptcy court determined that the Secretary had engaged in forum-shopping and that the district court for the Western District of Tennessee had interfered with the bankruptcy court's exclusive jurisdiction over the debtor's estate because the Secretary's suit was tantamount to an action to collect a debt rather than an exercise of a governmental unit's police power. "[D]ue to the sensitive nature of the jurisdictional issue at hand," the bankruptcy court declined to enter an order and referred the matter to the district court for the Southern District of Florida.

The district court for the Western District of Tennessee first addressed the jurisdictional issue in its July 27, 1999, findings and conclusions associated with its Order Denying the Motion to Dismiss. The court effectively incorporated these findings and conclusions in its Order on Welt's Motion for Reconsideration, which resulted in the preliminary injunction. The Trustee timely appealed from the preliminary injunction, which appeal was consolidated with his earlier appeal from the order directing him to deposit $616,158 with the clerk of the court. In this court, the Trustee challenges the district

court's assertion of jurisdiction to entertain the Secretary's suit.

## II

This court reviews a district court's decision to grant a preliminary injunction for abuse of discretion. *See Sandison v. Michigan High Sch. Athletic Ass'n*, 64 F.3d 1026, 1030 (6th Cir. 1995) (citing *American Imaging Svcs. v. Eagle-Picher Indus. (In re Eagle-Picher Indus.)*, 963 F.2d 855, 858 (6th Cir. 1992)). A court abuses its discretion when it relies on clearly erroneous findings of fact, applies an inappropriate legal standard, or improperly applies the law, with such legal questions receiving de novo review in the Court of Appeals. *See Sandison*, 64 F.3d at 1030; *Eagle-Picher*, 963 F.2d at 858. Therefore, a "legal or factual error may be sufficient to determine that the district court abused its discretion. However, absent such error, the district court's weighing and balancing of the equities is overruled 'only in the rarest of cases.'" *Sandison*, 64 F.3d at 1030 (quoting *Eagle-Picher*, 963 F.2d at 858 (citing *NAACP v. City of Mansfield,* 866 F.2d 162, 166 (6th Cir. 1989))). Since both of the Trustee's arguments challenge the district court's jurisdiction to hear the Secretary's FLSA action, we review the district court's conclusions with respect to its jurisdiction de novo.

The Trustee advances an argument based on bankruptcy policy: if the Secretary's suit were allowed and she obtained a judgment requiring the estate to pay more than half a million dollars to clear the taint on the records in question, she will have essentially elevated the unpaid workers' claim against the estate from the level of an administrative expense to a super-super-priority claim that trumps even CHF's secured super-priority § 364(d) interest by making the estate's access to the records dependent upon payment of the employees' wage claims. In support of this contention, the Trustee reasons that the bankruptcy court assumed jurisdiction over the debtor and all of its assets as of the original Chapter 11 filing in March 1999, nearly a year before

'lien' on the assets superior to that of a secured creditor." *Citicorp*, 483 U.S. at 38-39.

The Supreme Court treated § 215 as declaring contraband any goods tainted by their having been produced in substandard conditions. The Eleventh Circuit added that "Congress established the payment of a minimum wage as a condition precedent to the shipment of manufactured goods." *Rusco Indus.*, 842 F.2d at 274. One commentator analyzed these observations by considering the kind of property right that resulted from the *Citicorp* holding. He made three preliminary observations: 1) neither the Secretary nor the workers have a lien on the goods of either ordinary or super-priority status, 2) no trust is created because the creditor does not hold the property for the benefit of the workers or the Secretary, and 3) describing the Secretary's authority to bring suit as representing an "extortive interest" does not adequately describe the circumstances because the encumbrance created by § 215 goes well beyond pure extortion. *See* Henry Bregstein, *Secured Creditors and Section 15(a)(1) of the Fair Labor Standards Act: The Supreme Court Creates a New Property Interest*, 14 Cardozo L. Rev. 1965, 1974-78 (1993).

As Bregstein concluded, the property interest at stake in a "hot goods" action is best described as a fair-labor servitude, with the unpaid workers as its beneficiaries. *See id.* at 1978-82. Ordinarily, the Secretary's enforcement suit vindicates the interests of both the unpaid-worker beneficiaries of the fair-labor servitude and, derivatively, "all of the workers who are employed in commerce or the production of goods for commerce whose livelihoods are threatened by the introduction of tainted goods into the national economy." *Id.* at 1982.

In this particular case, however, as described above, the Secretary's enforcement action does not protect other workers in the economy because the records at issue here will not— unlike garments or windows and doors— enter commerce and

generate accounts receivable.[15] Indeed, their "movement" in interstate commerce is extremely limited: the Trustee asked to move them in commerce only for purposes of bringing them to Memphis, where he would gather information from the records in order to bill customers for services rendered. The Secretary's suit, therefore, does not prevent unfair competition.[16]   It does, however, promote a significant property interest— a property interest held by the affected employees.

*Citicorp*'s application of the FLSA to failed businesses and their creditors who seize tainted collateral seemed to create a new property right. In deciding the case, the Supreme Court noted that application of the "hot goods" provision does not grant employees a priority in the goods superior to that given a secured creditor under state law because the creditor still owns the goods and the employees have no possessory interest in them. "That [the secured creditor] can cure the employer's violation of the FLSA by paying the employees the statutorily required wages does not give the employees a

---

[15]The district court explained that the records are not just internal documents. They are produced by HSSI in part to fulfill its contractual obligation to patients to represent them in dealing with private insurers and Medicare and have some value to others, including patients and doctors who use them to develop a plan of care. These aspects of the records' limited intrinsic value confirm that their use in interstate commerce will not engender unfair competition with service providers who pay minimum wages.

[16]Any unfair competition that may have occurred in late January and February 1999 resulted not from the services of HSSI's employees being rendered in substandard conditions but HSSI's insolvency. The unfairness to HSSI's competitors came not from a violation of the FLSA but the fact that HSSI was marketing its services at a time when it was not meeting its continuing financial obligations as they came due. This unfairness inevitably occurs in an economy that permits companies to go bankrupt. It stems not from a violation of wage and hour laws but from the ability of businesses to pay creditors— including employees— less than the market value, or other agreed-upon price, for the services rendered or goods supplied to the failing business.

---

the Secretary filed suit in the district court. *See* 11 U.S.C. § 541 (defining property of a debtor's estate as any and all interests in property no matter where located and by whomever held as of the date of filing the petition). The Trustee asserts that the vesting of jurisdiction over the debtor's property in the bankruptcy court was to the exclusion of all other courts. Concerned that the Secretary's suit in the district court will disrupt the Bankruptcy Code's equitable distribution scheme and interfere with the bankruptcy court's jurisdiction over the liquidation, the Trustee draws a contrast between the Code's omission of any reference to the applicability and operation of the FLSA in bankruptcy proceedings and the Code's specific mention of certain other federal statutes. *See* 11 U.S.C. §§ 525, 742 (explaining interaction between certain Bankruptcy Code provisions and the Perishable Agricultural Commodities Act of 1930 and the Securities Investor Protection Act of 1970). This absence of reference to the FLSA, the Trustee contends, means that bankruptcy's equitable distribution scheme trumps the social policy embodied in the FLSA. *See* Def. Br. at 28.

For her part, the Secretary does not invoke FLSA social policy but instead relies directly on the Bankruptcy Code for two arguments in the alternative: the automatic stay provision, 11 U.S.C. § 362(a), does not apply to post-petition actions; and the automatic stay provision's exception, permitting enforcement actions by a governmental unit undertaken in furtherance of its police or regulatory power, *see* 11 U.S.C. § 362(b)(4), applies to this suit.

Unlike the Trustee's policy arguments, his point concerning the jurisdiction of the bankruptcy court is well-taken. But it controls only to the extent that the Bankruptcy Code forbids, through the automatic stay, proceedings that involve the debtor or its estate. That is, the bankruptcy court has exclusive jurisdiction over the debtor only to the extent that the Code makes its jurisdiction exclusive. *See infra* Part II.B. The automatic stay provision protects the bankruptcy court's jurisdiction by forbidding the commencement or prosecution

of most actions against the debtor or its property, but the automatic stay has exceptions. *See infra* Part II.A. The police power exception ordinarily would permit FLSA "hot goods" actions to proceed. *See infra* Part II.C. The peculiar circumstances of this case, however, reveal that the Secretary has undertaken this enforcement action not in furtherance of public policy but primarily to assert and protect the private rights of certain individuals. *See infra* Part II.C. Accordingly, the police power exception does not apply, the automatic stay governs, and the district court therefore had no jurisdiction to entertain the Secretary's suit.

### A

Filing a petition under the Bankruptcy Code, *see* 11 U.S.C. §§ 301, 302, 303, creates an estate consisting of all— subject to certain exemptions for individual debtors, *see* 11 U.S.C. § 522— of the debtor's property, broadly defined, *see* 11 U.S.C. § 541, at the moment of the filing and certain other property recaptured by the estate during the bankruptcy proceeding, *see, e.g.*, 11 U.S.C. §§ 547 (preferences), 548 (fraudulent transfers). This property becomes the "pot" from which all claims against the debtor, *see* 11 U.S.C. §§ 101(5), 502, will be paid pursuant to the Code's priority scheme, *see* 11 U.S.C. § 507. Commencement of a suit automatically imposes a broad stay of other proceedings against the debtor and its property. *See* 11 U.S.C. § 362(a).[4] "The purpose of the automatic stay is to protect creditors in a manner consistent with the bankruptcy goal of equal treatment. The

---

[4] "Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities, of— (1) the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title; [and] . . . (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . . ." 11 U.S.C. § 362(a).

prevent movement of tainted goods in interstate commerce. Yet courts have long held that the Secretary has implicit power under § 217 to sue to enjoin movement of "hot goods" in interstate commerce. *See, e.g., Powell v. State of Florida*, 132 F.3d 677, 678 (11th Cir. 1998); *Morelock v. NCR Corp.*, 546 F.2d 682, 688 (6th Cir. 1976), *rev'd on other grounds*, 435 U.S. 911(1978); *Wirtz v. Malthor*, 391 F.2d 1, 3 (9th Cir. 1968); *Wirtz v. Jones*, 340 F.2d 901, 904 (5th Cir. 1965). *See also* 29 U.S.C. § 211(a) (stating that "the Administrator shall bring all actions under section 217 of this title to restrain violations of this chapter," thereby implicitly recognizing authority to seek injunctions under § 217).

These cases recognize the important continuing public interest in restraining future violations of the FLSA's minimum wage and overtime provisions. The Supreme Court in *Citicorp* discerned the significant public interest in restraining lingering consequences of past FLSA wage and hour violations. In that case, the Court rejected the argument that a FLSA "hot goods" action should not be brought against a secured creditor when the employer has ceased operations because the "hot goods," garments in that case, maintained their ability to compete unfairly in the marketplace even after Citibank seized them as collateral. The Eleventh Circuit extended this reasoning to a defunct manufacturer of windows and doors. *See Rusco Indus.*, 842 F.2d at 273. Both *Citicorp* and *Rusco Industries* described the public interests at stake in a typical "hot goods" action that remained even though the employer had gone out of business: specifically, the unfair competition that results when products of underpaid workers enter interstate commerce. *Cf.* 29 U.S.C. § 202(a)(3), (5).

In this particular case, however, that significant public interest in protecting other businesses from unfair competition is not present because the "goods" are merely records relating to services already rendered by employees. The records have little intrinsic value; they will not be sold in interstate commerce; they can be used by the Trustee only to

rights, with only an incidental public interest in the litigation, for it to fall outside the police power exception. A pure § 216(c) suit, which does not even attempt to exclude from interstate commerce goods produced under substandard conditions but seeks merely to recover unpaid minimum wages, unpaid overtime, and liquidated damages, only incidentally serves the public interest. A § 216(c) suit does seek (via the liquidated damages award) to punish wrongdoers and thereby provide a general deterrent to unfair labor practices, but even this award is remitted to affected employees. The Secretary's prosecution of such a suit serves little public purpose other than a general interest in seeing laws enforced— a public interest no greater than that served by the hypothetical state attorney general suing to enforce a private contract.[14] Pure § 216(c) suits fail the public policy test and are, therefore, not covered by the police power exception to the automatic stay. To the extent the Secretary brought this action under § 216(c), then, the exception does not apply and the automatic stay does.

In certain cases— perhaps most cases— a FLSA "hot goods" action by the Secretary serves significant public interests apart from an attempt to vindicate the private rights of employees. The Secretary has long treated this lawsuit as a "hot goods" action, and her complaint invoked 29 U.S.C. § 217 in addition to § 216(c) as authority for her power to file suit. Section 217 does no more than confer jurisdiction on district courts "to restrain violations of section 215 of this title." It does not parallel § 216(c) by explicitly conferring on the Secretary authority to bring a suit for an injunction to

---

[14]The rights conferred by FLSA §§ 206, 207, and 216(b), (c) are private rights to a minimum level of payment, a subject otherwise covered by the private relationship between employer and employee. A § 216 suit to enforce a Congressionally guaranteed minimum private right differs from an EEOC action to enforce Title VII in that the rights vindicated by a Title VII action are Congressionally created civil rights against discrimination in private employment, which is a policy overriding the specifics of private agreements.

stay of pre-petition proceedings enables the bankruptcy court to decide whether it will exercise its power under § 502(b) of the Bankruptcy Code to establish the validity and amount of claims against the debtor or allow another court to do so . . . ." *Hunt v. Bankers Trust Co.*, 799 F.2d 1060, 1069 (5th Cir. 1986) (footnotes omitted). The stay helps "preserve what remains of the debtor's insolvent estate and . . . provide a systematic equitable liquidation procedure for all creditors, secured as well as unsecured, thereby preventing a 'chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts.'" *Holtkamp v. Littlefield*, 669 F.2d 505, 508 (7th Cir. 1982).

Companies or individuals attempting to reorganize their affairs under Chapter 11 continue to conduct business during the pendency of the proceedings, with the bankruptcy case designed to give the debtor a second chance by permitting discharge of certain pre-petition debts, payment (over time and under court supervision) of certain pre-petition creditors, and use by the debtor of proceeds from ongoing operations to finance continuing operations and get the debtor back on its feet. A Chapter 11 debtor in possession remains obligated to pay most liabilities arising after commencement of the bankruptcy proceeding: post-petition debts are generally treated as administrative expenses to which the automatic stay provision does not apply. *See* 11 U.S.C. §§ 362(a)(1); 503(b); *In re Hemingway Transp., Inc.*, 954 F.2d 1 (1st Cir. 1992) (holding that the term administrative expenses for "preservation of the estate," includes protection of assets of the estate as well as post-petition operation of the debtor's business).

**B**

"The jurisdiction of the bankruptcy courts, like that of other federal courts, is grounded in, and limited by, statute." *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995). Title 28 U.S.C. § 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil

proceedings arising under title 11, or arising in or related to cases under title 11." The district courts may, in turn, refer "any or all proceedings arising under title 11 or arising in or related to a case under title 11 . . . to the bankruptcy judges for the district." 28 U.S.C. § 157(a). The district court for the Southern District of Florida has done so, and its referral order conferred jurisdiction on the bankruptcy court.

Once a bankruptcy proceeding begins in one court, the concurrent jurisdiction of other courts is partially stripped. *See In re United States Brass Corp.*, 110 F.3d 1261, 1268 (7th Cir. 1997). In addition to exclusive jurisdiction over the bankruptcy proceeding itself, "[t]he district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate." 28 U.S.C. § 1334(e); *see also In re Modern Boats, Inc.*, 775 F.2d 619, 620 (5th Cir. 1985). However, the exclusivity of the bankruptcy court's jurisdiction reaches only as far as the automatic stay provisions of 11 U.S.C. § 362. That is, if the automatic stay applies to an action directed at the debtor or its property, jurisdiction is exclusive in the bankruptcy court. If the automatic stay does not apply— *e.g.*, if an exception to the stay covers the action in question— the bankruptcy court's jurisdiction is concurrent with that of any other court of competent jurisdiction. And if the bankruptcy court grants relief from the stay with respect to certain property or claims, *see* 11 U.S.C. § 362(d), (e), (f), the bankruptcy court retains jurisdiction over those matters, although its jurisdiction is concurrent with that of other courts of competent jurisdiction. *See In re Ridgemont Apartment Assocs.*, 105 B.R. 738 (Bankr. N.D. Ga.1989) (lifting stay with respect to certain property in the bankruptcy court's exclusive jurisdiction and thereby allowing state court actions relating to the property to proceed); *see also In re Carlomagno Shipping, S.A.*, 185 B.R. 25, 27 (E.D. La. 1995); *In re Hohenberg*, 143 B.R. 480 (Bankr. W.D. Tenn. 1992); *Morgan Guar. Trust Co. v. Hellenic Lines*, 38 B.R. 987 (S.D.N.Y. 1984). Accordingly,

correct and as rapidly as practicable to eliminate the conditions above referred to in such industries . . . ."

29 U.S.C. § 202. Congress proceeded to establish a minimum wage (§ 206), overtime pay requirements (§ 207), regulations of child labor (§ 212), and exemptions from the FLSA's coverage (§ 213) in furtherance of these policy goals. These regulations all stated national labor policy.

In 29 U.S.C. § 216, Congress imposed penalties for violations of the FLSA and created two parallel vehicles for enforcement. Section 216(b) confers on employees the right to sue for unpaid minimum wages, unpaid overtime wages, and an equal amount as liquidated damages. Section 216(c) authorizes the Secretary of Labor to bring an action for the same wages and damages, and automatically terminates the right of the individual employee to sue for wages covered by the Secretary's suit, further specifying that "[a]ny sums thus recovered by the Secretary of Labor on behalf of an employee pursuant to this subsection shall be held in a special deposit account and shall be paid . . . directly to the employee or employees affected." 29 U.S.C. § 216(c). This provision authorizes the Secretary to bring an action against employers to recover *exactly the same wages and damages* as the individual employee whose rights were violated could obtain in his own suit— and the provision further specifies that any such recovery be forwarded to the employee for his personal benefit. A § 216(c) suit thus does no more than ascertain the rights of a private individual and obtain a judgment for that individual's benefit. A § 216(c) suit is, therefore, a prime example of a suit by a governmental unit to adjudicate private rights. *See Wirtz v. C & P Shoe Corp.*, 336 F.2d 21, 30 (5th Cir. 1964) (observing that, in general, in a § 216(c) suit, "the Government becomes an active protagonist for the double purpose of protecting private interests and vindicating public rights").

Still, as explained above, this fact does not end the inquiry. A suit must be undertaken principally to adjudicate private

to certain private parties vis-a-vis other creditors of the estate, contrary to the Bankruptcy Code's priorities.[13]

This case illustrates well the distinction between general public policy interests and the private rights at stake when a governmental unit engages in a particular enforcement action. Congress made specific findings and declared national policy in the FLSA itself:

> The Congress finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce. . . . It is declared to be the policy of this chapter . . . to

---

[13]*See, e.g, In re Mansfield Tire & Rubber Co.*, 660 F.2d 1108, 1114 (6th Cir. 1981) (recognizing as covered by the police power exception a state's administration of workers' compensation claims filed by a debtor's employees when successful claims would be paid not by the debtor but an insurance fund, such that claimants would gain no advantage over other creditors of the estate); *see also Eddleman v. United States Dep't of Labor*, 923 F.2d 782, 784 (10th Cir.1991), *overruled in part on other grounds by Temex Energy, Inc. v. Underwood, Wilson, Berry, Stein & Johnson*, 968 F.2d 1003 (10th Cir. 1992) (holding that a suit by the Department of Labor to enforce the Service Contract Act, in which the government sought liquidation of certain workers' back-pay claims, was within the police power exception because the suit enforced the Act's policies and "back-pay claimants would not receive any extra priority by virtue of the" lawsuit, but instead would have to collect their claims in bankruptcy).

if no exception to the automatic stay permitted the Secretary's suit to go forward, the Western District of Tennessee had no jurisdiction to entertain the suit because the bankruptcy court in Florida had exclusive jurisdiction over the debtor and its property, including the records at issue in this case.

Not surprisingly, courts have uniformly held that when a party seeks to commence or continue proceedings in one court against a debtor or property that is protected by the stay automatically imposed upon the filing of a bankruptcy petition, the non-bankruptcy court properly responds to the filing by determining whether the automatic stay applies to (*i.e.*, stays) the proceedings. *See In re Baldwin-United Corp. Litig.*, 765 F.2d 343, 347 (2d Cir. 1985) ("Whether the stay applies to litigation otherwise within the jurisdiction of a district court or court of appeals is an issue of law within the competence of both the court within which the litigation is pending . . . and the bankruptcy court."). Assuming its jurisdiction is otherwise sound, the non-bankruptcy court may enter orders not inconsistent with the terms of the stay and any orders entered by the bankruptcy court respecting the stay. *See Hunt*, 799 F.2d at 1069 ("other district courts retain jurisdiction to determine the applicability of the stay to litigation pending before them, and to enter orders not inconsistent with the terms of the stay"). If, for example, the suit before the district court may proceed because an exception to the automatic stay authorizes prosecution of the suit, the district court may enter needful orders not themselves inconsistent with the automatic stay. *See Commodity Futures Trading Corp. v. CO Petro Mktg. Group, Inc.*, 700 F.2d 1279, 1283-84 (9th Cir. 1983).

If the non-bankruptcy court's initial jurisdictional determination is erroneous, the parties run the risk that the entire action later will be declared void *ab initio*. *See Schwartz v. United States*, 954 F.2d 569, 570-71 (9th Cir. 1992); *NLRB v. Edward Cooper Painting, Inc.*, 804 F.2d 934, 940 (6th Cir. 1986). If a state court and the bankruptcy court reach differing conclusions as to whether the automatic stay

bars maintenance of a suit in the non-bankruptcy forum, the bankruptcy forum's resolution has been held determinative, presumably pursuant to the Supremacy Clause. *See Raymark Indus. v. Lai*, 973 F.2d 1125, 1132 (3d Cir. 1992) (bankruptcy court and state court both held action in state court not barred by the stay, but the Third Circuit reversed the bankruptcy court and remanded with instructions to enter an order vacating the judgment of the state court under an exception to the *Rooker-Feldman* doctrine). Administrative proceedings before a federal agency may likewise be declared void *ab initio* if a court determines that the agency incorrectly determined that the stay did not bar the proceedings.[5] *See Edward Cooper Painting*, 804 F.2d at 940. We are unaware of a conflict arising between a federal district court and a bankruptcy court, and note that such a conflict would have to be resolved by an appellate court with jurisdiction to hear appeals from both fora.

## C

In concluding that it had jurisdiction over this case, the district court relied exclusively on the police-power exception to the automatic stay provision, which provides that "[t]he filing of a petition . . . does not operate as a stay— . . . (4)

---

[5] If a non-bankruptcy forum correctly determines that an exception to the automatic stay applies and that, therefore, an action against the debtor or its property may proceed, "debtors are not left without an avenue for relief if they or the estate would be harmed . . . . The bankruptcy court has '"ample other powers"' to stay such an action, including the discretionary power under 11 U.S.C. § 105(a) to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.'" *United States v. Commonwealth Cos. (In re Commonwealth Cos.)*, 913 F.2d 518, 527 (8th Cir. 1990) (quoting *Missouri v. Bankruptcy Court for the E.D. of Ark.*, 647 F.2d 768, 776 n.14 (8th Cir. 1981), and citing *Word v. Commerce Oil Co. (In re Commerce Oil Co.)*, 847 F.2d 291, 297 (6th Cir. 1988)). Presumably, any action so stayed would not be void *ab initio* because the non-bankruptcy forum had jurisdiction to entertain it, but had to stay the action upon the order of the bankruptcy court.

debtor-customer to enforce a contract obligation. Although the suit would effectuate the state's public policy in favor of enforcing contractual obligations or requiring payment of damages, the suit essentially enforces the supplier's private rights against the debtor and would result in a pecuniary advantage to the state-favored supplier vis-a-vis other creditors of the debtor's estate.

Applying this test is a difficult undertaking, and many cases will be close. For example, the Eighth Circuit held a suit by the EEOC against a debtor-employer for alleged sex discrimination within the police power exception because the EEOC acted "'at the behest and for the benefit of specific individuals [but] also to vindicate the public interest in preventing employment discrimination.'" *EEOC v. The Rath Packing Co.*, 787 F.2d 318, 325 (8th Cir. 1986) (quoting *General Tel. Co. v. EEOC*, 446 U.S. 318, 325-26 (1980) (describing Congressional intent in expanding the EEOC's Title VII enforcement power because individual suits had proved insufficiently effective in promoting national civil rights policy)). Accordingly, courts should examine the type of enforcement action brought and the relationship between a particular suit and Congress's (or a state's) declared public policy. When an action furthers both public and private interests and the private interests do not significantly outweigh the public benefit from enforcement, courts should defer to the legislature's decision to vest enforcement authority in the executive and recognize such actions as within "such governmental unit's police and regulatory power," as that term is used in § 362(b)(4). However, when the action incidentally serves public interests but more substantially adjudicates private rights, courts should regard the suit as outside the police power exception, particularly when a successful suit would result in a pecuniary advantage

pecuniary interest test, as refined by the Eighth Circuit.[12] Nevertheless, the Secretary's suit would result in a pecuniary advantage to certain *private parties* vis-a-vis other creditors' interests in the debtor's estate, a situation addressed by this court's public policy test.

All acts of Congress by definition declare national policy, and lawsuits to enforce those acts necessarily effectuate the public policy of the United States. But *Rusco Industries* failed to recognize that the public policy test calls upon courts to analyze whether *a particular lawsuit* is undertaken by a governmental entity in order to effectuate public policy or, instead, to adjudicate private rights. This is true because, in fashioning § 362(b)(4), Congress did not except from the automatic stay all lawsuits undertaken by appropriate governmental authorities; it expressly limited the exception to suits by a governmental unit "to enforce such governmental unit's police and regulatory power." This court's pecuniary interest and public policy tests recognize this limitation and are designed to sort out cases in which the government is bringing suit in furtherance of *either* its own or certain private parties' interest in obtaining a pecuniary advantage over other creditors. *See Missouri v. Bankruptcy Court*, 647 F.2d at 776 (recognizing state grain laws as regulatory in nature but holding a suit to enforce them outside police power exception because the suit related to pecuniary interests in the debtor's property). The existence of the public policy test naturally presumes that some suits by governmental units, even though they would effectuate certain declared public policies, will nevertheless be regarded as largely in furtherance of private interests. An extreme example of such would be a suit by a state attorney general on behalf of a supplier against its

---

[12]*Cf. In re Commerce Oil*, 847 F.2d at 296 ("Punishing wrongdoers, deterring illegal activity, recovering remedial costs of damage to the environment, providing for the costs of administration, and weighing the social and economic value of a discharge source are exercises of the state's regulatory power to effectuate public policy and are not actions based upon the state's property interests.").

under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's . . . police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action . . . to enforce" such power. 11 U.S.C. § 362(b) (1998).[6] By this provision, Congress declared that the policy set forth in the Bankruptcy Code's automatic stay provision yields to state and federal governmental interests in securing compliance with certain aspects of those authorities' respective regulatory and police powers. *See Midatlantic Nat'l Bank v. New Jersey Dept. of Envtl. Prot.*, 474 U.S. 494, 502 (1986); *In re Commerce Oil Co.*, 847 F.2d at 295 (holding the Tennessee Water Quality Control Board's proceedings to fix civil liability against a debtor under the Tennessee Water Control Act within the police power exception). When a governmental unit decides to undertake an enforcement action and believes its action falls within the police power exception, it need not petition the bankruptcy court for permission to proceed in the ordinary course, but, as explained above, the agency runs the risk that a court will later find its action outside the exception's ambit and declare the action void *ab initio*. *See Edward Cooper Painting*, 804 F.2d at 940.

---

[6]The Trustee's contention that the § 362(b)(4) exception to the stay only excepts actions mentioned in § 362(a)(1) (actions to recover a claim) and does not, therefore, permit actions described in § 362(a)(3) (acts to obtain possession or control over a debtor's property), suffers from a fatal flaw: it refers to a version of § 362 no longer in effect. Before 1998, the Trustee's argument would have warranted close examination, *see Javens v. City of Hazel Park*, 107 F.3d 359, 367-70 (6th Cir. 1997) (discussing the overlap between § 362(a)(1) and § 362(a)(3) and the extent to which the § 362(b)(4) exception applies to cases in the overlapping territory). But Congress re-wrote § 362(b) by consolidating subsection (b)(5) into subsection (b)(4) and applying the new subsection (b)(4)'s police power exception to actions stayed by subsections (a)(2), (3), and (6), in addition to subsection (a)(1). *See* Pub. L. 105-277 § 603.

To determine whether an action qualifies as a proceeding pursuant to a governmental unit's police or regulatory power, and therefore falls outside the ambit of the automatic stay, this court applies two tests: the pecuniary purpose test and the public policy test.

> Under the pecuniary purpose test, reviewing courts focus on whether the governmental proceeding relates primarily to the protection of the government's pecuniary interest in the debtor's property, and not to matters of public safety. Those proceedings which relate primarily to matters of public safety are excepted from the stay. Under the public policy test, reviewing courts must distinguish between proceedings that adjudicate private rights and those that effectuate public policy. Those proceedings that effectuate a public policy are excepted from the stay.

*In re Commerce Oil Co.*, 847 F.2d at 295 (citing *Edward Cooper Painting*, 804 F.2d at 942 (adopting tests set forth in *In re Wellham*, 53 B.R. 195 (Bankr. M.D. Tenn.1985))); *see also In re Commonwealth Cos.*, 913 F.2d at 523-24 (refining the "pecuniary interest" test by redirecting the analysis toward inquiring whether the action "would result in a pecuniary advantage to the government vis-a-vis other creditors of the debtor's estate"). Interpreting the previous version of § 362(b), which distinguished between prosecution of proceedings (covered by § 362(b)(4)) and enforcement of judgments (covered by § 362(b)(5)), this court commented,

> Paragraph (4) excepts commencement or continuation of actions and proceedings by governmental units to enforce police or regulatory power. Thus, where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay. Paragraph (5) makes clear that the exception extends to permit an injunction

to introduce the goods in question into interstate commerce. In such event, he could, of course, destroy the goods. Or he could elect to clear the taint and free himself from the injunction, *see* 11 U.S.C. § 503(b)(1)(A) (authorizing payment of the actual and necessary costs of preserving the estate, *i.e.*, administrative expenses), thereby enabling him to use the goods to collect debts owed to HSSI for services rendered.[11] These consequences of a successful suit demonstrate that the Secretary's action would not result in a pecuniary advantage to the government, so her suit passes the

---

from the stay because the police power exception permits only "the enforcement of a judgment other than a money judgment," 11 U.S.C. § 362(b)(4). Therefore, in excepted cases, non-bankruptcy fora have jurisdiction to reduce claimed civil liability to a money judgment. We note that the questions of whether the district court's Payment Order or a subsequent judgment ordering the Trustee to clear the taint on goods already moved in interstate commerce (with the permission of the court) constitute "money judgments" within the meaning of § 362(b)(4) are close questions. *See, e.g, Penn Terra Ltd. v. Department of Envtl. Res.*, 733 F.2d 267 (3d Cir. 1984) (holding that an action by the government to compel cleanup of environmental hazard fell within § 362(b)(4), (5) exceptions even though injunctive relief required expenditure of money and judgment fixed civil penalties for failure to comply with consent decree).

[11]Although the question is not before us, a cursory review of FLSA law suggests that the Trustee may clear the taint by paying significantly less than the full amount of all employees' contract-based wage claims against the estate, because the FLSA only covers certain employees, *see* 29 U.S.C. § 213 (creating exemptions), and mandates only a minimum hourly wage, *see* 29 U.S.C. § 206, and 150% of an employee's ordinary wage for overtime, *see* 29 U.S.C. § 207. Thus, even if the Secretary were to prosecute her suit successfully, some HSSI employees would receive nothing and others would receive only a fraction of their ordinary wages. *Cf. Rusco Indus.*, 842 F.2d at 272 n.3 (noting that parties agreed that employees would receive anything in excess of minimum wages and overtime "in accordance with the priority scheme of the Bankruptcy Code").

The Eleventh Circuit's analysis falls short of the mark, particularly as applied to the facts of this case.

Through her "hot goods" action, the Secretary is not attempting to protect the United States's *pecuniary* interest in the debtor's property, nor would maintenance of her action "result in a pecuniary advantage *to the government* vis-a-vis other creditors of the debtor's estate." *In re Commonwealth Cos.*, 913 F.2d at 523-24 (emphasis added).[9] If the Secretary were to prevail in her suit in equity, she would not gain title to the goods nor obtain a money judgment against HSSI's bankruptcy estate.[10] Instead, the Trustee would be forbidden

---

[9] We join the Eighth Circuit in refining the "pecuniary interest" test to focus our inquiry on whether the enforcement action would result in a pecuniary *advantage* to the government vis-a-vis other creditors of the bankruptcy estate. *See In re Commonwealth Cos.*, 913 F.2d at 523-34. As that court explained, "this limitation on the scope of § 362(b)(4) is consistent with Congress's rationale for not extending the exception to permit enforcement of a money judgment." *Ibid.* (relying on legislative history and collecting cases reaching consistent results). We do not agree, however, with the Eighth Circuit's seeming unwillingness to apply this rule uniformly. *See id.* at 523 n.8 (citing *Rusco Industries* and describing the FLSA as an example of an instance "where Congress intended that the preference resulting from the enforcement of a particular statutory provision would take precedence over the Bankruptcy Code's distribution scheme"). We must apply the test uniformly in order to prevent a class of government-favored creditors from obtaining a pecuniary advantage over other creditors who must stand in the places assigned by the Bankruptcy Code's carefully drawn priority scheme. Since Congress has not explicitly stated, in either the FLSA or the Code, that creditors with FLSA claims enjoy a priority position different from similarly situated creditors without FLSA claims, we see no reason to deviate from ordinary application of the pecuniary advantage test.

[10] Even if the Secretary's suit would result in a money judgment, that fact would not eliminate the jurisdiction of the district court. The police power exception allows actions that fix the civil liability of a debtor for violations of federal law, *see Edward Cooper Painting*, 804 F.2d at 942-43, *and In re Kovacs*, 717 F.2d 984, 988 (6th Cir. 1983), *aff'd sub nom. Ohio v. Kovacs*, 469 U.S. 274 (1985), although a judgment creditor will be unable to collect any money judgment from a debtor without relief

---

and enforcement of an injunction, and to permit the entry of a money judgment, but does not extend to permit enforcement of a money judgment.

*Commerce Oil Co.*, 847 F.2d at 295; *accord Missouri v. Bankruptcy Court*, 647 F.2d at 775 ("'police or regulatory power' refers to the enforcement of state laws affecting health, welfare, morals, and safety, but not regulatory laws that directly conflict with the control of the *res* or property by the bankruptcy court"). As the district court aptly put it, "[p]ursuant to these complementary tests, an action will only be exempt from the automatic stay of the Bankruptcy Code if the action has been instituted to effectuate the public policy goals of the governmental entity, as opposed to actions instituted to protect the entity's pecuniary interest in the debtor's property or to adjudicate private rights."

To support her contention that the instant suit furthers the Department of Labor's public policy goals, the Secretary directs us to the Supreme Court's description, *see Citicorp Indus. Credit, Inc. v. Brock*, 483 U.S. 27 (1987), of Congressional labor policy as announced in the FLSA. In *Citicorp*, a financing company loaned a garment manufacturer millions of dollars in operating capital on a revolving basis pursuant to a security agreement that gave the company extensive monitoring rights and a security interest in goods, inventory, receivables, and other assets. *See id.* at 29. When the business collapsed, the financing company took possession of the collateral, including the manufacturer's inventory of finished goods. Employees engaged in manufacturing the goods had not been paid for work performed in the three weeks prior to the company's closing its doors. The manufacturer did not file for bankruptcy.[7]

---

[7] The Supreme Court expressly avoided considering the application of a § 215 "hot goods" action in the context of a bankruptcy proceeding. *See id.* at 39 n.10.

Since some of the goods in the secured creditor's hands had been produced in violation of the FLSA, *see id.* at 33, the Secretary of Labor filed suit to enjoin the creditor from introducing the goods into commerce, *i.e.*, selling them and using the proceeds. *See id.* at 30-31. The creditor urged the Court to recognize an unwritten exception to 29 U.S.C. § 15(a)(1) that would permit "innocent" secured creditors to traffic in "hot goods." The Supreme Court refused, relying first on contrary "plain language of the statute," and additionally discerning Congressional intent make the "hot goods" provision applicable to all persons, innocent or not, other than those specifically exempted by § 215(a)(1) (*i.e.*, common carriers and good faith purchasers). *See id.* at 35.

The financing company asked the court to look beyond the plain language of the statute, citing *Holy Trinity Church v. United States*, 143 U.S. 457, 459 (1892), arguing that application of the provision to secured creditors did not further Congress's purpose of establishing decent hours and wages for workers because creditors that take possession of collateral are not responsible for failing to pay the statutory wages.[8] The Court agreed that Congress wanted to improve working conditions, but it found additional public policy goals delineated in 29 U.S.C. § 2(a), which "reflects Congress' desire to eliminate the competitive advantage enjoyed by goods produced under substandard conditions." *Id.* at 36. "'The motive and purpose of the present regulation are plainly . . . that interstate commerce should not be made

---

[8] The financing company also argued, as does the Trustee here, that prosecution of a "hot goods" action against a party other than the producer of the goods when the producer has ceased operations does nothing to guarantee the minimum compensation levels sought by Congress. The Supreme Court dismissed that argument. *See id.* at 33 n.4 ("[T]he plain language of the Act . . . is not limited to ongoing concerns and makes no exception for employers who are financially or otherwise unable to comply with §§ [206, 207]. The proposition that an employer complies with the FLSA so long as its promised wage rates equal or exceed the statutory minimum, regardless of whether employees actually receive any compensation, would render illusory the Act's protections.")

the instrument of competition in the distribution of goods produced under substandard labor conditions, which competition is injurious to the commerce.'" *Id*. at 37 (quoting *United States v. Darby*, 312 U.S. 100, 115 (1941)). The Court went on to hold that application of § 215(a)(1) to secured creditors furthered those goals by excluding tainted goods from interstate commerce. "Had the Department of Labor not obtained an injunction in this case, . . . the 'hot goods' produced by these uncompensated employees would have competed with goods produced in conformity with the FLSA's minimum wage and overtime requirements." *Ibid*. After noting that "exclusion from interstate commerce of goods produced under substandard conditions . . . is itself a central purpose of the FLSA," *id*. at 36 n.8, the Court quoted with approval a lower court's reasoning that a "hot goods" injunction "'*will also discourage the type of commercial financing which leads to minimum wage and overtime violations*.'" *Id*. at 38 (quoting *Ford v. Ely Group, Inc.*, 621 F. Supp. 22, 26 (W.D. Tenn. 1985), and adding emphasis).

*Citicorp* did not address the application of §§ 215(a)(1) and 216(c) in the context of a bankruptcy, but the Eleventh Circuit has. That court relied on the Supreme Court's description of Congressional policy as embodied in the FLSA to conclude that a "hot goods" action falls within the § 362(b)(4) police power exception to the automatic stay. *See Brock v. Rusco Indus.*, 842 F.2d 270, 273 (11th Cir. 1988). Without analysis of either the pecuniary interest or public policy tests, the court concluded that "the Secretary brought the suit to protect legitimate businesses from unfair competition and to enforce the federal law regarding minimum wage," bringing it within the police power exception to the automatic stay. *Ibid*. The court continued: "Not only does the [automatic stay] exception permit the Secretary's action to proceed, but it also permits the Secretary to enforce the action. This is an injunction under [29 U.S.C. § 217] to prevent the sale of 'hot goods' in interstate commerce; it is not an action for damages." *Ibid*.